**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AIDAN   DOYLE,   MICHAEL   SMITH,   and
WILLIAM PAYBARAH

Plaintiffs,

**DOCKET # 14-CV-2831 (JMF)(FM)**

vs.

THE CITY OF NEW YORK,

Defendant

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Stoll, Glickman & Bellina, LLP
by Andrew B. Stoll (AS8808)
475 Atlantic Avenue
Brooklyn, NY  11217
(718) 852-3710
astoll@stollglickman.com

## <u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| I. | STATEMENT OF FACTS | 1 |
| II. | SUMMARY OF ARGUMENT | 1 |
| III. | STANDARD OF REVIEW | 2 |
| IV. | THE BREADTH OF THE "SUFFER OR PERMIT" DEFINITION OF EMPLOYMENT, AND THE NARROWNESS OF ITS EXCEPTIONS | 3 |
| V. | DEFENDANT DOES NOT QUALIFY FOR THE "PUBLIC AGENCY VOLUNTEER" EXCEPTION TO THE FLSA BECAUSE PLAINTIFFS NEITHER "PLAINLY AND UNMISTAKABLY" PERFORMED THEIR WORK FOR CIVIC, CHARITABLE, OR HUMANITARIAN REASONS, NOR "PLAINLY AND UNMISTAKABLY" WORKED WITHOUT PRESSURE OR COERCION, DIRECT OR IMPLIED, FROM THE CITY OF NEW YORK | 5 |
| VI. | THE CITY'S MANDATORY WELFARE WORK PROGRAM IS THE STRONGEST ANALOGY TO PLAINTIFFS' RELATIONSHIP WITH THE CITY | 9 |
| VII. | THE "TRAINEE" AND INTERN EXCEPTIONS TO THE FLSA ARE INAPPLICABLE TO PLAINTIFFS | 14 |
| VIII. | THE "PRIMARY BENEFIT" ANALYSIS USED IN THE DOMESTIC SERVANT CONTEXT IS INAPPLICABLE TO THIS CASE | 17 |
| IX. | UNDER THE JOINT EMPLOYER TEST, PLAINTIFFS WERE EMPLOYEES | 19 |
| X. | THE TRUE NATURE OF THE RELATIONSHIP HERE | 21 |

TABLE OF AUTHORITIES

**Cases**

Arnold v. Ben Kanowsky, Inc., 361 U.S. 388 (1960) .......................................................... 6, 7, 17

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ........................................................................................ 4

Barfield v New York City Health and Hospitals Corp., 537 F3d 132 (2d Cir 2008) . 12, 20, 21, 22

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ......................................................................... 4

Brock v Superior Care, Inc., 840 F2d 1054 (2d. Cir. 1988) ......................................................... 4

Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697 (1945) .................................................................. 24

Brown v New York City Dept. of Educ., 755 F3d 154 (2d Cir 2014) ............................................ 6

Carver v. State of New York, 87 AD3d 25 (2d Dept. 2011) ............................................... 12, 14, 23

Eisenberg v Advance Relocation & Stor., Inc., 237 F3d 111 (2d Cir 2000) ............................... 12

Velez v. Sanchez, 693 F.3d 308 (2d Cir. 2012) ..................................................................... 19, 20

Elwell v. Weiss, 03-CV-6321, 2007WL2994308 (WDNY 2006) .................................... 12, 14, 17

Fraticelli v MSG Holdings, L.P., 13-CV-6518(JMF), 2014 WL 1807105 (SDNY 2014) ........... 17

Glatt v Fox Searchlight Pictures, 11-CV-6784(WHP), 2011WL2495140 (SDNY 2013) 15, 18, 21

Goldberg v Whitaker House Co-op., Inc., 366 US 28 (1961) ...................................................... 6

Holmes v. Grubman, 568 F.3d 329 (2d Cir.2009) ................................................................... 4, 7

Jayquan Brown v. New York City Department of Education, 755 F3d 154 (2d Cir 2014) ... 6, 7, 8

Martin v Malcolm Pirnie, Inc., 949 F2d 611 (2d Cir 1991) .......................................................... 6

McGarry v. Pallito, 687 F.3d 505 (2012) ................................................................................... 11

Poventud v. City of New York, 750 F.3d 121 (2d Cir 2014) ................................................... 10, 11

Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947) ............................................................ 5

Smith v. Bank of America Corp., 865 F.Supp.2d 298 (EDNY 2012) ......................................... 11

Stone v. McGowan, 308 F.Supp. 2d 79 (NDNY 2004) ........................................................ 12, 14

Tony and Susan Alamo Found. v Secretary of Labor, 471 US 290 (1985). .................... 15, 16, 24

United States v. City of New York, 359 F.3d 83 (2d Cir. 2004) ............................... 12, 15, 16, 24

Vanskike v Peters, 974 F2d 806 (7th Cir 1992) ......................................................................... 24

Walling v Portland Term. Co., 330 US 148 (1947) ...................................................................... 5

Zheng v Liberty Apparel Co. Inc., 355 F3d 61 (2d Cir 2003) ............................................ 5, 9, 21

**Statutes**

C.P.L. § 170.55 ................................................................................................................ 2, 3, 16

29 C.F.R. § 553.101(a ..................................................................................................... 7, 8, 9

29 U.S.C. § 203(g) ...................................................................................................................... 5

Federal Rule of Civil Procedure 12(b)(6) ............................................................................... 3, 4

**Other Authorities**

City of New York Department of Investigation Release 23-2005, Statement From Department of Investigation Commissioner Rose Gill Hearn Regarding the Arrest of City Parks Worker (Mar. 18, 2005) .................................................................................................................. 9

City of New York Department of Investigation Release 32-2006, DOI Arrests Parks Employee for Accepting Bribes (Apr. 25, 2006), ...................................................................................... 9

City of New York Department of Investigation Release 64-2006, DOI Arrests Parks Employee for Accepting Bribe (Jun. 28, 2006).................................................................................................9

Meyer, Josh, "2 Park Employees Face Charges of Bribe Solicitation", Los Angeles Times, 24 February 24, 1993 .................................................................................................................. 10

I.      STATEMENT OF FACTS

Plaintiffs have brought this action pursuant to the United States Fair Labor Standards Act ("FLSA"), as a collective action to recover minimum wage for individuals who, as a condition of an "adjournment in contemplation of dismissal" ("ACD"), pursuant to New York Criminal Procedure Law § 170.55, agree to "perform services for a public or not for profit corporation". C.P.L. § 170.55 (6).   ACDs are granted to individuals accused of relatively minor charges; a criminal defendant is never compelled to perform such services pursuant to an ACD, as failure to comply with any such conditions results merely in a continuation of an open criminal case, which would otherwise have been automatically dismissed. C.P.L. §170.55 (2).   "Dozens, perhaps hundreds" of individuals ("the laborers") perform such services for the City of New York for no pay virtually every day. <u>First Amended Complaint</u>,   ¶ 2.   The laborers work for various City agencies, for the most part cleaning, and performing the same jobs that paid, even unionized employees perform. <u>Id.</u> ¶ 3, 4.   Defendant has moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing predominantly that plaintiffs are "volunteers", outside the protections of the FLSA, and that because plaintiffs receive a benefit for their labors, they are not entitled to minimum wage.

II.     SUMMARY OF ARGUMENT

This lawsuit is designed to remedy a situation that falls squarely within the intent and purposes of the minimum wage and the FLSA- that is, to prevent unfair competition, to avoid downward pressure on wages, and to protect unprotected and unorganized workers. "Employment" is very broadly defined for the purposes of the FLSA, and while the courts have crafted several tests involving an array of overlapping factors depending on the context, Defendant's motion to dismiss has failed to address or analyze virtually any of those factors.

Instead, Defendant argues repeatedly that plaintiffs were volunteers.  But voluntariness is a term of art under the FLSA, and is an inapplicable specifically and narrowly delineated exception to the broad application.  Not only do plaintiffs fall outside the precisely defined exception, they are not even volunteers in an intuitive sense, due to the pressures inherent in any plea bargaining system.  The choice for even an innocent person to face a continuing, burdensome, and frightening prosecution, over the option of sweeping a park for a couple days and having his case dismissed, is one that "perhaps only a hero could refuse".

Finally, while Defendant emphasizes that plaintiffs receive a benefit for their work, such an exchange does not mean in any sense that plaintiffs are not "employees"; all employees receive benefits in exchange for their work, or they wouldn't work.  But the cases Defendant cites refer to benefits that incidentally flow from the work itself- such as true internships (also very specifically defined), which offer the worker value that derives from the work *experience*, or domestic servants, who may not qualify as "employees" if they are family members who benefit from the fruits of their own cooking and cleaning.

Defendants make virtually no other arguments.  Plaintiffs, who stand convicted of no crimes and thus, like pre-trial detainees, are in no need of rehabilitation or whatever minimal training their menial labor might entail, were entirely controlled by the City while they labored, and they were the City's employees.

III.     STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of a plaintiff. Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). The Court will not dismiss pursuant to Rule 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a facially

plausible claim to relief. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The Complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and "more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The question or whether an employee-employer relationship exists is an issue of law. See Brock v Superior Care, Inc., 840 F2d 1054, 1059 (2d Cir. 1988).

IV.   THE BREADTH OF THE "SUFFER OR PERMIT" DEFINITION OF EMPLOYMENT, AND THE NARROWNESS OF ITS EXCEPTIONS

The FLSA was "written in the broadest possible terms so that the minimum wage provisions would have the widest possible impact in the national economy." Carter v Dutchess Community Coll., 735 F2d 8, 12 (2d Cir 1984) holding mod by Danneskjold v Hausrath, 82 F3d 37 (2d Cir 1996) and holding mod by Zheng v Liberty Apparel Co. Inc., 355 F3d 61 (2d Cir 2003).  The act defines "employ" as to "suffer or permit to work". 29 U.S.C. § 203(g), and is "comprehensive enough to require its application to many persons and working relationships, which prior to (the) Act, were not deemed to fall within an employer-employee category." Walling v Portland Term. Co., 330 US 148, 150-51 (1947).  In fact, the FLSA provides 'the broadest definition [of 'employ'] that has ever been included in any one act'. Zheng v Liberty Apparel Co. Inc., 355 F3d 61, 69 (2d Cir 2003) (internal citations omitted).  An important aim of the FLSA is elimination of unfair competition, not only among employers, but also among workers looking for jobs. Carter v Dutchess Community Coll., 735 F2d 8, 13 (2d Cir 1984).

Where there may nevertheless be some ambiguity in the putative employment relationship, Courts have focused on the "economic reality" of the relationship.  Since economic reality is determined based upon all the circumstances, any relevant evidence may be examined to avoid narrowing the test to a legalistic definition. See Rutherford Food Corp. v. McComb, 331

3

U.S. 722, 730 (1947).  But "the overarching concern in evaluating the 'economic reality' is whether the alleged employer possessed the power to control the workers in question." Zheng v Liberty Apparel Co. Inc., 355 F3d 61, 66 (2d Cir 2003) *citing*  Herman v RSR Sec. Services Ltd., 172 F3d 132, 139 (2d Cir 1999).   This predominating question of control was the central question the Supreme Court explored in the earliest case applying the "economic reality" test to an FLSA action, which highlighted that the employer there, like the City here, could "expel them for substandard work or for failure to obey the regulations". Goldberg v Whitaker House Co-op., Inc., 366 US 28, 32-33, (1961), First Amended Complaint, ¶¶ 6-7.

In further exploring "economic reality" in different contexts, the circuit courts of the United States Court of Appeals have crafted myriad economic reality tests for FLSA "employment" to be applied to different circumstances.  Among them, courts have applied tests to distinguish between independent contractors and employees, to identify whether a business is a "joint" employer, to determine whether a worker is a "trainee", to distinguish between domestic servants and household members, and to determine whether prison labor qualifies as employment.

Finally, because the FLSA is a remedial statute, exemptions to its broad coverage "are to be narrowly construed against the employers seeking to assert them," Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960); Jayquan Brown v New York City Dept. of Educ., 755 F3d 154, 163 (2d Cir 2014).  Thus, the putative employer bears the burden of proving the exemption.  See Martin v Malcolm Pirnie, Inc., 949 F2d 611, 614 (2d Cir 1991).  The application of an exemption is limited to situations "*plainly and unmistakably* within (its) terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960) (emphasis added).

4

Defendant's most persistent argument is that plaintiffs were not employees, but "volunteers".

> V.    DEFENDANT DOES NOT QUALIFY FOR THE "PUBLIC AGENCY VOLUNTEER" EXCEPTION TO THE FLSA BECAUSE PLAINTIFFS NEITHER "PLAINLY AND UNMISTAKABLY" PERFORMED THEIR WORK FOR CIVIC, CHARITABLE, OR HUMANITARIAN REASONS, NOR "PLAINLY AND UNMISTAKABLY" WORKED WITHOUT PRESSURE OR COERCION, DIRECT OR IMPLIED, FROM THE CITY OF NEW YORK.

Defendant emphasizes the proposition that plaintiffs "volunteered" their labors to the City, going so far as to re-label plaintiffs as "ACD volunteers".[1]  Whether a worker is a public agency volunteer within the meaning of the FLSA is an issue of law. See Jayquan Brown v. New York City Department of Education, 755 F3d 154, 163 (2d Cir 2014).   Defendant's memorandum of law ignores the very specific tests that apply to the FLSA exceptions they invoke, and they conflate and confuse distinct concepts of law.   As noted above, FLSA exceptions must be narrowly construed, and the burden of proving their plain and unmistakable applicability is on the putative employer. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960).  The "public agency volunteer exception" to the FLSA is very specifically defined, and applies only when every element of the exception is satisfied.[2]  It fails here for two reasons.

First, the DOL regulations define a public agency volunteer as one "who performs hours of service for a public agency for civic, charitable, or humanitarian reasons..." 29 C.F.R. § 553.101(a).  Paragraph nine of the First Amended Complaint unambiguously asserts plaintiffs "do not perform their work for civic, charitable, or humanitarian reasons".  The allegation must be accepted as true for the purposes of the motion to dismiss.  Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).  In fact, nowhere does Defendant even claim to the contrary, nor do they

---

[1] "Volunteer" or "Voluntary" appears 42 times in Defendant's fifteen page motion.
[2] The exception itself is defined not in the FLSA, but in the Department of Labor regulations, which are entitled to Chevron deference. Jayquan Brown v. New York City Department of Education, 755 F3d 154 N.4 (2d Cir 2014).

argue that plaintiffs' claim is facially implausible.  This fact alone defeats Defendant's claim, for the purposes of their motion, that plaintiffs were volunteers who fell outside of the protections of the FLSA.[3]

Secondly, 29 C.F.R. § 553.101(c) further narrows the exception by clarifying that "(i)ndividuals shall be considered volunteers only where their services are offered freely and without pressure or coercion, direct or implied, from an employer."  Defendant essentially concedes that plaintiffs felt pressure or coercion to perform their work, but claims that any such pressure or coercion is not brought to bear by the City, but by the "criminal court or the prosecutors".  Defendant's Memorandum of Law, ¶ 10.

But as Defendant concedes, and as pled in paragraph 12 of the First Amended Complaint, plaintiffs required a report by the City agencies of their attendance, in order to avoid a continued prosecution.  The threat that plaintiffs would not receive confirmation of their work comes not from the courts or prosecutors, but from the city agencies that benefitted from plaintiffs' labors. The courts and prosecutors were not on the ground, evaluating plaintiffs' performance, and reporting their attendance- the City agencies, which directly supervise plaintiffs' labor, are.

One can analogize to a temporary staffing agency and the worksite where they send their employees; the temp agency may not pay the employees if they fail to come to work, but the worksite employer unquestionably plays a part in the pressure the employee feels to show up and perform to earn that pay.[4]  An entity's functional control over workers, even in the absence of

---

[3] Even if plaintiffs worked for mixed motives, including a "trivial" civic, charitable or humanitarian purpose, that still may not suffice to qualify the laborer as a "volunteer" according to the Second Circuit, who left the question open. Jayquan Brown v. New York City Department of Education, 755 F3d 154 N.6 (2d Cir 2014).  Were that a question here, plaintiffs would strongly argue that a "trivial" purpose would not suffice, as, for example, virtually any public interest employee has some "trivial" secondary or tertiary purpose in working in their chosen field, without that fact converting them to volunteers for FLSA purposes.

[4] Typically the worksite employer and the temp agency would be considered "joint employers" for the purposes of the FLSA, a test explored below in section VIII.

formal control, qualifies it as an employer under the broad definitions in the FLSA. <u>Zheng v</u> <u>Liberty Apparel Co. Inc.</u>, 355 F3d 61, 72 (2d Cir 2003).  Here, the city agencies unquestionably exercised functional control over the plaintiffs, and through that control, in a very real, common sense analysis, at the very least, implicitly pressured plaintiffs to stay and work their shifts.  This is precisely what is proscribed by 29 C.F.R. § 553.101(c).  It is hard to imagine a starker example of direct or implied pressure or coercion to "volunteer" one's labor, than the threat to withhold a report that is the one thing standing between the accused and the courthouse doors and maybe even the jailhouse doors.

This common sense conclusion is corroborated by at least three reported occasions when *Parks Department employees*, not prosecutors or judges, have been arrested and charged with receiving bribes for falsely reporting completion of community service by laborers under their supervision. <u>See</u>, City of New York Department of Investigation Release 64-2006, DOI Arrests Parks Employee for Accepting Bribe (Jun. 28, 2006), http://www.nyc.gov/html/doi/downloads/pdf/pr64gregoryferguson_62706.pdf;   City of New York Department of Investigation Release 23-2005, Statement From Department of Investigation Commissioner Rose Gill Hearn Regarding the Arrest of City Parks Worker (Mar. 18, 2005), http://www.nyc.gov/html/doi/downloads/pdf/pr23pope_parks31805.pdf; City of New York Department of Investigation Release 32-2006, DOI Arrests Parks Employee for Accepting Bribes (Apr. 25, 2006), http://www.nyc.gov/html/doi/downloads/pdf/pr32billups406.pdf.

These public New York City reports rather vividly illustrate the reasonable common sense inference that the Court should, respectfully, draw in plaintiffs' favor on this 12(b)(6) motion- that the pressure City agencies put on plaintiffs is so strong that the laborers may be

7

motivated to try to bribe their way out of performing their duties.[5]  Were there no implicit

pressure to perform the work, the laborers would not need to bribe their way out- they could

simply walk away without consequence.  And it is most notable that the bribes are not offered to

prosecutors or judges- they are offered to Parks Department supervisors, defeating Defendant's

claim that any pressure on plaintiffs to work was brought solely by prosecutors or the courts.

Finally, Defendant's memorandum misleadingly equates "consent" to an ACD with

"volunteering" for the labor.  That a criminal defendant consents on the record to an adjournment

of his case (the "A" in "ACD" is for "Adjournment") doesn't mean he's "volunteered" for

anything.  The distinction between formalistic "consent" to an ACD and actual "volunteering" to

pick up trash on the Cross Bay Bridge over Jamaica Bay for 7 hours on a cold February day (as

Plaintiff Smith did) is starkly illustrated by Judge Gerard Lynch's moving concurrence in the

recent Second Circuit decision of <u>Poventud v. City of New York</u>, 750 F3d 121, 144-46 (2d Cir

2014).  There, Judge Lynch extensively discussed the pressures brought to bear by our plea-

bargaining system:

> The choice of freedom in exchange for an admission would be
> easy for a guilty man, but even an innocent one would be hard
> pressed to decline the prosecution's offer. A hero might resist the
> bargain and insist that he would not accept the ignominy of falsely
> admitting guilt... Poventud did what I suspect most ordinary human
> beings would do in his situation, even if they were innocent... he
> pled guilty when presented with an offer that perhaps only a hero
> could refuse.

<u>Poventud v City of New York</u>, 750 F3d 121, 144-46 (2d Cir 2014) (Concurrence of Gerard E.

Lynch).

---

[5] These pressures are not unique to New York- <u>see</u> Meyer, Josh, "2 Park Employees Face Charges of Bribe Solicitation", Los Angeles Times, Feb 24. 1993 *avail. at* <u>http://articles.latimes.com/1993-02-04/local/me-1204_1_community-service-work-</u> Notably, both the New York City of Investigation reports and the LA Times article highlight the enormous benefits the cities reap from this free labor source- the LA Times cites "millions of dollars in free labor for cash-strapped cities and counties"; one of the DOI reports goes so far as to claim that "those sentenced to community service *will have to keep the parks clean and green the way they are supposed to*" (Emphasis added).

Judge Lynch went on to highlight the distinction between legal formalisms and reality, emphasizing that "specific legal judgments with very particular legal consequences" do not necessarily reflect objective, "existential" truth. <u>Poventud</u>, at 146. While the <u>Poventud</u> decision concerns a guilty plea, which an ACD is decidedly not, Judge Lynch eloquently highlighted the reality in this case- that consent to an ACD and even a few days' labor to avoid the burden and uncertainty of a criminal prosecution is an entirely logical choice motivated by "powerful inducements" unrelated to a charitable, or humanitarian instinct. <u>Poventud</u>, N.4.[6]  And the City, as reflected by an official statement by Rose Gill Hearn, Commissioner of the New York City Department of Investigation, unquestionably pressures "those sentenced to community service... to keep the parks (and City) clean and green the way they are supposed to". Statement From Department of Investigation Commissioner Rose Gill Hearn Regarding the Arrest of City Parks Worker                    (Mar.                    18,                    2005), <u>http://www.nyc.gov/html/doi/downloads/pdf/pr23pope_parks31805.pdf</u>.[7]

VI.    THE CITY'S MANDATORY WELFARE WORK PROGRAM IS THE STRONGEST ANALOGY TO PLAINTIFFS' RELATIONSHIP WITH THE CITY

In <u>United States v. City of New York</u>, the Second Circuit analyzed whether individuals who were required to work for the City for welfare benefits were "employees" for the purposes of <u>Title VII</u>. <u>United States v. City of New York</u>, 359 F.3d 83 (2d Cir. 2004).  In conducting its

---

[6] Though Defendant justly does not argue that the labors in question constitute punishment or rehabilitation, it is nevertheless worth emphasizing that a pretrial defendant "clothed with the presumption of innocence" is in no need of rehabilitation, and pre-trial detainees and the accused require no "legitimate rehabilitative interest in 'educating offenders about real world responsibilities.'" <u>See</u> <u>McGarry v. Pallito</u>, 687 F.3d 505 (2012).  The "granting of an adjournment in contemplation of dismissal *shall not be deemed to be a conviction or an admission of guilt. No person shall suffer any disability or forfeiture as a result of such an order.*" <u>Smith v. Bank of America Corp.</u>, 865 F.Supp.2d 298 (EDNY 2012) (emphasis in original, internal quotations omitted).

[7] Though Ms. Hearn used the phrase "sentenced", plaintiffs are not sentenced, as they have been convicted of nothing; however, she and even the press coverage of this very case, lose sight of this potentially significant distinction, and lumps all "community service" workers together.

analysis, the Court placed "the greatest emphasis on the extent to which the hiring party controls *the manner and means by which the worker completes his or her assigned tasks*". Id at 92 (emphasis added).[8]  The Second Circuit has clarified in the broader FLSA context that "even when one entity exerts 'ultimate' control over a worker that does not preclude a finding that another entity exerts sufficient control to qualify as a joint employer." Barfield v New York City Health and Hospitals Corp., 537 F3d 132, 148 (2d Cir 2008).

Although US v. City of New York was a Title VII case, and not an FLSA case, courts have consistently reasoned since then that since the FLSA definition of employment is broader than Title VII, workfare constitutes "employment" for the purposes of the FLSA, as well.  See Stone v. McGowan, 308 F.Supp. 2d 79, 86 (NDNY 2004) (denying defendant's motion to dismiss on the ground that WEP participants are not employees under the FLSA); Elwell v. Weiss, 03-CV-6321, 2007WL2994308 (WDNY 2006) (definition of "employee" under FLSA is broader than under Title VII, and under "economic reality" test, WEP participants were employees under FLSA); Carver v. State of New York, 87 AD3d 25 (2d Dept. 2011) (under "economic reality test", FLSA applies to WEP participants).

The WEP participants in the above referenced cases, like plaintiffs, were temporary workers performing menial tasks.  Exactly like the WEP participants, "plaintiffs' work was

---

[8] The complete list of considerations were: [1] the hiring party's right to control the manner and means by which the product is accomplished...[;] [2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party. Eisenberg v Advance Relocation & Stor., Inc., 237 F3d 111, 114 (2d Cir 2000).

completely controlled by the various agencies for which they worked", such that the City controlled entirely "the manner and means by which the worker completes his or her assigned tasks". <u>US v. City</u>, at 92.  The prosecutors or courts may send the plaintiffs to the City agencies, and may even exert ultimate control over the fate of the criminal case, but "the agencies entirely control the manner and means by which the laborers complete their tasks", "the agencies can and do occasionally eject the laborers from the job site for failure to perform their duties or for inappropriate job site conduct", and "the laborers are constantly supervised by the agencies". <u>First Amended Complaint</u> ¶¶  4, 7, 9, 34, 41.  It is perfectly apparent that at the site, the manner and means of labor are controlled by the City.

As to the other factors in footnote 8 above, factors two through four all easily tilt in plaintiffs' favor; the skill requirement is low (factor 2), the tools and instrumentalities are sourced by the City (factor 3), and the work takes place at City designated sites which the City even may drive the plaintiffs to (factor 4) (<u>First Amended Complaint</u>, ¶ 34).  The fifth factor would weigh against plaintiffs, since the nature of the work is transient, but even day laborers are unquestionably covered by the FLSA, so this is solely a question for the much stricter <u>Title VII</u> test for "employment".

The City can assign as many projects as they want to the workers for the duration of the worker's obligation (factor 6).  The City can end a day early or tell workers how long their day would last (factor 7). <u>First Amended Complaint</u>, ¶¶ 34, 41.

Factor eight, the method of payment, does not weigh in plaintiffs' favor since of course the very basis of this suit is the fact that plaintiffs are not paid.  It would thus be circular indeed to hang one's hat on the lack of pay as the reason plaintiffs were not entitled to pay; the factor is discussed more extensively in the following paragraphs.  Factor 9 weighs in plaintiffs' favor,

11

since they had no discretion in "hiring assistants", the work, maintaining parks and highways, is a core function of the City (factor 10). As to factor 11, the City may not be "in business", but again, the FLSA is applied unambiguously to the governmental entities. See See Stone v. McGowan, 308 F.Supp. 2d 79, (NDNY 2004); Elwell v. Weiss, 03-CV-6321, 2007WL2994308 (WDNY 2006); Carver v. State of New York, 87 AD3d 25 (2d Dept. 2011). Plaintiffs are eligible at the least for workers' compensation which, "of course, is typically associated with employment" (factor 12). First Amended Complaint, ¶ 5. US v. City, at 95-96. Virtually every applicable factor of this test then, weighs in plaintiffs' favor.

In fact, the only potential distinction between the workfare plaintiffs and plaintiffs here is factor 8- the method of payment. The workfare employees received "remuneration" in the form of cash benefits and child care. This matters little, however, for three reasons. First, "remuneration" is part of the more restrictive Title VII test for employment, inapplicable to FLSA cases. Second, the US Supreme Court has minimized the significance of compensation for determining employment in the FLSA context. Third, plaintiffs in any case did receive benefits other than cash that qualify as "remuneration" and "compensation", the value of which, Defendant concedes, "cannot be overstated". Defendant's Memorandum of Law, P. 9.

In United States v. New York, the Second Circuit explained that Title VII has a two prong test for determining whether a person is an employee. The first prong is to demonstrate that the person was "hired". US v. New York, at 91-92. It is that prong for which "remuneration" is a prerequisite. The FLSA, however does not contain the "hired" prong. Rather, much more passive behavior defines "employ" under the FLSA- that is, "suffer or permit". This is plainly broader language, and there can be no question that the City at the bare minimum "suffered or permitted" plaintiffs to work in its parks and on its roads and bridges.

12

The City handed plaintiffs the tools they needed to clean, it drove them to their worksites, it supervised them and reported their performance.  And without the cash remuneration distinction, the workfare plaintiffs in US v. City are virtually indistinguishable from plaintiffs.

Next, even to the extent that compensation (or remuneration) is one factor among many to consider in applying any of the myriad FLSA employment tests, its importance is minimized by the Supreme Court's admonition that "the purposes of the Act require that it be applied even to those who would decline its protections. If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act".  Tony and Susan Alamo Found. v Secretary of Labor, 471 US 290, 302, (1985).  Thus, the factor that plaintiffs understood they would not be paid "adds little, because the FLSA does not allow employees to waive their entitlement to wages".  Glatt v Fox Searchlight Pictures Inc., 11-CV-6784(WHP), 2011WL2495140 (SDNY 2013) on reconsideration in part, 11-CV-6784(WHP), 2013 WL 4834428 (SDNY 2013) and mot to certify appeal granted, 11-CV-6784(WHP), 2013 WL 5405696 (SDNY 2013).

Finally, plaintiffs did in fact receive "remuneration", or "compensation" for their labors, as "remuneration" need not be a salary. US v. City of New York, at 92.  First, their eligibility for workers' compensation, which "of course, is typically associated with employment" has explicitly been recognized by the Second Circuit as "remuneration".  United States v. City of New York, at 95-96.  Secondly, plaintiffs received a favorable report to the Courts of their completion of their labors, *a benefit that, Defendant concedes, "cannot be overstated"*. Defendant's Memorandum of Law, P. 9.  "(T)he fact that the compensation is primarily in

benefits rather than cash is immaterial..." <u>Tony and Susan Alamo Foundation v. Secretary of Labor</u>, 471 US 290, 291 (1985).

Finally, <u>Tony and Susan Alamo Foundation</u>'s reasoning applies strongly to this case, as exceptions to coverage like this "would affect many more people than those workers directly at issue in this case, and would be likely to exert a downward pressure on wages..." <u>Tony and Susan Alamo</u>, at 302.  The First Amended Complaint cites "dozens, perhaps hundreds", of class members *every day*, who work "alongside paid, even unionized employees", saving the City "at the least, many thousands of dollars a year"; "the laborers' work competes in the marketplace with other laborers and employers, and the City avoids hiring and paying additional employees by utilizing their free labor.  For example, according to William Castro, the Manhattan Borough Commissioner of the New York City Department of Parks and Recreation, to address chronic summertime park litter the City supplements its summer maintenance crews with the laborers, as it is 'the perfect job for them'". <u>First Amended Complaint</u>, ¶¶ 4, 13.

It is hard to imagine how such easily "recruited" free labor could *not* exert a downward pressure on wages in the City, and on the ability of laborers and unions to negotiate fair wages. It is precisely for this reason that the FLSA has such a broad application, "so that the minimum wage provisions would have the widest possible impact in the national economy." <u>Carter v Dutchess Community Coll.</u>, 735 F2d 8, 12 (2d Cir 1984).  In this light, the clear economic reality is that plaintiffs are employees of the City; even if merely as day laborers.  They're just not paid as such.

VII.  THE "TRAINEE" AND INTERN EXCEPTIONS TO THE FLSA ARE INAPPLICABLE TO PLAINTIFFS

Defendant argues that because plaintiffs "primarily benefited" from their own labors, or because they labored "for their own personal purpose", they were not employees.  Defendant

fails, however, to articulate why these factors should matter, or what tests the factors are derived from.  The "primary benefit" factor is drawn substantially from the line of FLSA cases dealing with trainees, or unpaid interns.  The notion that plaintiffs were "trainees" or "interns" in the traditional sense of the word, in the menial, low skilled jobs they performed is easily disposed of.

Equally importantly, there is a specific Department of Labor test, as this Court has observed, that is "at least relevant to, and perhaps dispositive of, the inquiry." <u>Fraticelli v MSG Holdings, L.P.</u>, 13-CV-6518(JMF), 2014 WL 1807105 (SDNY 2014) (internal citations omitted). The test weighs whether "(1) the internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment; (2) the internship experience is for the benefit of the intern; (3) the intern does not displace regular employees, but works under close supervision of existing staff; (4) the employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded; (5) the intern is not necessarily entitled to a job at the conclusion of the internship; and (6) the employer and the intern understand that the intern is not entitled to wages for the time spent in the internship." <u>Id.</u>

Before evaluating whether plaintiffs fit under the trainee exception, it is important to reiterate that FLSA exceptions must be narrowly construed and the burden of proving their plain and unmistakable applicability is on the putative employer.  <u>Arnold v. Ben Kanowsky, Inc.</u>, 361 U.S. 388, 392 (1960) (emphasis added).

The first factor is easy; there is nothing about plaintiffs' work similar to training which would be given in an educational environment (First Amended Complaint, paragraph 14). <u>See Elwell v. Weiss</u>, 03-CV-6321, 2007WL2994308 (WDNY 2006) (difficult to conceive that

washing cars, digging ditches, carrying drywall and mopping floors is rehabilitative or designed to help achieve economic independence).

The second factor is whether the internship *experience* was for plaintiffs' benefit. Defendant seems to urge a "primary benefit" analysis drawn from other circuits, and suggests that plaintiffs received the "primary benefit" of the arrangements in question.[9]  However, that analysis "has little support" in Supreme Court precedent concerning the trainee exception to the FLSA.  Glatt v. Fox, at 531-532.  Plaintiffs simply do not benefit from the work *experience*. Like any employee, they derive a benefit from their labors, or they wouldn't be performing them. But those benefits are not *incidental to* the work, nor do they derive from the work *experience*- they are *in exchange for* the work, which is precisely the case with any employee and the pay or benefits they receive in exchange for their labor.

As to the third factor, plaintiffs *do* displace regular employees (First Amended Complaint, ¶ 15), and as to the fourth factor, the City receives immediate advantages in the form of a cleaner park or highway and, on a larger scale, a cleaner city, with every blow of the litter spike.  Defendant minimizes the value of plaintiffs' labor, but the First Amended Complaint abundantly pleads the substantial benefits the City reaps from the labors of the class, and one clean park for one day is no less a benefit for the City, as it avoids paying an employee to perform the same function.

It is thus plain that not only does the mandated narrow application of the trainee or unpaid intern exception to the FLSA fall flat, but even applying the framework to assist in determining the "economic reality" of the relationship benefits plaintiffs' position.

---

[9] Defendant limits the benefit they cite to the termination of plaintiffs' criminal proceedings.  They admirably do not argue that defendants gain rehabilitation or basic life skills from the menial labor, and the Second Circuit has been clear that there is no legally cognizable inference that pretrial detainees are in need of any such training or rehabilitation.  See McGarry v. Pallito, 687 F.3d 505 (2012).

VIII.   THE "PRIMARY BENEFIT" ANALYSIS USED IN THE DOMESTIC
SERVANT CONTEXT IS INAPPLICABLE TO THIS CASE

Defendant cites <u>Velez v. Sanchez</u>, 693 F.3d 308 (2d Cir. 2012), for the proposition that the Court should consider who "primarily benefitted from the relationship".   But Defendant omits that the <u>Velez</u> court was specifically noting factors "particularly relevant for distinguishing a domestic service worker from a member of a household who incidentally performs household tasks", since "(t)his consideration will help distinguish, for example, children who were promised an allowance for their participation in household chores for over eight hours a week, who perform those chores as part of their membership in the household, from domestic workers". <u>Velez</u>, N.13.

As with the trainee exception, it is plain that the benefits this factor speaks to are benefits *incidental to the work itself*- the child who does household chores benefits directly from the work itself, as opposed to a domestic servant, whose receives benefits like pay, room and board, *in exhchange for* his services.   To apply the factor as Defendant suggests would create the paradox that the more a person is remunerated, the less likely he is an employee.   And <u>Velez</u> itself is explicitly discussing the context of a domestic worker, never suggesting the factor should be applied outside that context or the context from which it was drawn- that is, the trainee exception.

Even if the Court were to weigh the primary beneficiary in a looser manner here, it is far from plain that the City benefits less than plaintiffs.   The City saves probably millions of dollars in labor; plaintiffs avoid prosecutions on low level offenses that they could very well beat at trial or which might get dismissed pre-trial.

While Defendant referenced the inapplicable and unhelpful "primary benefit" factor from the <u>Sanchez</u> opinion, they failed to analyze the remaining factors that the Court found helpful in

17

evaluating the relationship in the domestic servant context, which the Velez court drew "from the various decisions discussing the test for 'economic reality' in different contexts." Velez at 329. The factors are: (1) the employer's ability to hire and fire the employee; (2) the method of recruiting or soliciting the employee; (3) the employer's ability to control the terms of employment, such as hours and duration; (4) the presence of employment records; (5) the expectations or promises of compensation; (6) the flow of benefits from the relationship; and (7) the history and nature of the parties' relationship aside from the domestic labor. Velez at 330.

With respect to the first factor, the City had the right to accept, reject, or eject any employee it chose to. First Amended Complaint, ¶¶ 6, 7. This is the equivalent of the City's right to hire or fire. That the DA's office or the courts could ultimately give the worker an opportunity to labor for another employer or agency does not undermine plaintiffs' argument since "even when one entity exerts "ultimate" control over a worker that does not preclude a finding that another entity exerts sufficient control to qualify as a joint employer." Barfield v New York City Health and Hospitals Corp., 537 F3d 132, 148 (2d Cir 2008).

For the second factor, the City could plainly ask the Courts to send it candidates for work. Beyond that, this factor (which does not seem to appear in any other tests) seems crafted to distinguish a family member asking another family member to come live with them and help out, from a domestic servant who answers an advertisement or is placed by an agency. For the third factor, the City plainly controlled the hours and duration of work they required before favorably reporting a completed day of service. For the fourth factor, the City maintains attendance records, in which it refers to the laborers as "employees." First Amended Complaint ¶ 8.

Although for the fifth factor, there was no promise of expectation of compensation, as noted above, the fact "adds little, because the FLSA does not allow employees to waive their

18

entitlement to wages". <u>Glatt v Fox Searchlight Pictures Inc.,</u> 11-CV-6784(WHP), 2011WL2495140 (SDNY 2013) (Citing <u>Susan and Tony Alamo</u>.) The compensation question is addressed more extensively above, on page 12-13.

The sixth factor is the "flow of benefits" argument addressed at the beginning of this section; it's simply not applicable where the benefits in question are in exchange for, and not incidental to, the labor. Finally, the seventh factor, like the second, seems quite specifically crafted for the domestic servant context; the history and nature of the relationship between these parties is far from the sort of familial relationship that would defeat a domestic servant claim. In sum, applying the relevant factors the Second Circuit found helpful in the domestic servant context, plaintiffs were, as a matter of economic reality, employees of the City.

## IX.   UNDER THE JOINT EMPLOYER TEST, PLAINTIFFS WERE EMPLOYEES

A strongly analogous test for employment was explored by the Second Circuit in <u>Barfield v New York City Health and Hospitals Corp.,</u> 537 F3d 132 (2d Cir 2008). <u>Barfield</u> involved nurses who were directly employed by staffing agencies, who claimed that Bellevue Hospital, where they labored, was their joint employer for FLSA purposes. The analogy to plaintiffs, who are placed at the City agencies by the district attorneys' offices, is strong. The <u>Barfield</u> Court noted "(t)he fact that the referral agencies themselves may have exercised 'ultimate' authority in these areas does not alter the fact that Bellevue also exercised some authority which helps establish the economic reality of its status as a joint employer." <u>Barfield v New York City Health and Hospitals Corp.,</u> 537 F3d 132, 144 (2d Cir 2008).[10]

---

[10] <u>Barfield</u>'s predecessor case in the Second Circuit held conversely that the definition of "employ" in the FLSA "cannot be reduced to formal control over the physical performance of another's work" and that an entity can be an employer "even when it does not hire and fire its joint employees, directly dictate their hours, or pay them". <u>Zheng v Liberty Apparel Co. Inc.,</u> 355 F3d 61, 70 (2d Cir 2003).

The <u>Barfield</u> Court first applied a "formal control" common law test for employment, and found three out of four of the factors weighed in the plaintiffs' favor.  Like Bellevue Hospital in <u>Barfield</u>, the City of New York "had the undisputed power to hire and fire at will" employees referred to work on its premises; "supervised and controlled employees' on-site work schedules and conditions of employment"; and "maintained employment records *confirming referred workers' certifications and the shifts they worked*." <u>Barfield v New York City Health and Hospitals Corp.</u>, 537 F3d 132, 144 (2d Cir 2008) (emphasis added); <u>See</u> <u>First Amended Complaint</u>, ¶¶ 6-9, 12.

After weighing the "formal control" test, the <u>Barfield</u> Court applied the "functional control" test it had established in <u>Zheng v Liberty Apparel Co. Inc.</u>  "1) (Plaintiffs) worked on (Defendant's) premises using (Defendant's) equipment; (2) no referral agency shifted its employees as a unit from one hospital to another, but instead each assigned health care workers, including Barfield, to the same facility whenever possible to ensure continuity of care; (3) (Plaintiffs) performed work integral to (Defendant's) operation; (4) (Plaintiff's) work responsibilities... remained the same regardless of which agency referred her for a particular assignment; (5) (Defendant) effectively controlled the on-site terms and conditions of (Plaintiff's) employment; and (6) Barfield worked exclusively for Bellevue. <u>Barfield</u> at 145.

Factors 1, 3, 4, and 5 apply specifically to this case, and weigh in plaintiffs' favor.  Factor 2 does not much apply, as plaintiffs' tenure was necessarily limited.  Likewise, factor 6, due to the transient nature of the work, is essentially inapplicable.  Ultimately, the <u>Barfield</u> Court ruled easily in the plaintiffs' favor, "looking beyond a defendant's formal control over the physical performance of a plaintiff's work...to give full content to the broad 'suffer or permit' language in the statute". <u>Barfield</u> at 146 (internal citation and quotations omitted).

The <u>Barfield</u> Court emphasized again "the work at issue involved personal services performed on Bellevue's premises, using only Bellevue equipment. Further... she was directly supervised only by Bellevue staff. *Indeed, the same work is routinely performed by Bellevue's full-time employees, with temporary agency-referred workers being hired to fill in when regular staff are unavailable.*" <u>Barfield</u> at 146-47 (emphasis added).  This is precisely the case here, where plaintiffs are used to supplement the City's own work crews. <u>See</u> <u>First Amended Complaint</u> ¶ 13.

Finally, referring to a United States Department of Labor opinion, the <u>Barfield</u> Court cited the "'great degree of control and supervision' evidenced by the fact that all work was performed on hospital premises, all equipment and supplies used by the private nurses were provided by the hospital, the hospital required the private nurses to report to the hospital's nursing office at the start and end of each tour, and the hospital was legally obligated to provide some oversight of the nurses and to take action if the nurses failed to comply with hospital policies. <u>Barfield</u> at 150.  These considerations are squarely on point with the present case.

## X.      THE TRUE NATURE OF THE RELATIONSHIP HERE

In holding that workfare workers were employees under the FLSA, the Second Circuit and the New York State Appellate Division, Second Department, called out the "artificial dichotomy" that "one must be either a welfare recipient or an employee and cannot be both". <u>United States v City of New York</u>, 359 F3d 83, 94 (2d Cir 2004); <u>Carver v State</u>, 87 AD3d 25, 32 (2d Dept 2011).  It is no less an artificial dichotomy to say that one cannot be both an ACD recipient and an employee.

Essentially, the arrangement in question here is a bargained for exchange.  Plaintiffs are not ordered by the Courts to perform their community service- they agree to do it in exchange for

a benefit.  But nothing in that agreement, or in the law, precludes them from being paid the federally mandated minimum wage for their hard work, and as discussed throughout this memo, if they meet the definition of employee under the FLSA, they cannot waive that mandate.

Ultimately, the "prime purpose" of the minimum wage is to "aid the unprotected, unorganized, and lowest paid of the nation's working population, that is, those employees who lack sufficient bargaining power". Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706 (1945). Elimination of unfair competition, not only among employers, but also among workers looking for jobs is a goal that serves that end. Carter v Dutchess Community Coll., 735 F2d 8, 13 (2d Cir 1984).

"For every (arrestee) who is assigned to sweep a floor or wash dishes for little or no pay, there is presumably someone in the outside world who could be *hired* to do the job-someone who would have to be paid at least $4.25 an hour", Vanskike v Peters, 974 F2d 806, 810-12 (7th Cir 1992).  That is the dominant "economic reality" in this case, which speaks directly to the Supreme Court's concern about "downward pressure on wages". Tony and Susan Alamo, at 302.

The Courts have remained committed to applying the Second Circuit's admonition to interpret the FLSA in an "expansive manner" that has "the widest possible impact in the national economy".  The exploited free labor of thousands and thousands and thousands and thousands of innocent people who unwittingly compete directly with the public and unions for honest, decent jobs is an ideal place to shine a light and continue that progress.

Brooklyn, New York
August 15, 2014

_____

Stoll, Glickman & Bellina, LLP
by Andrew B. Stoll
475 Atlantic Avenue
Brooklyn, NY  11217
(718) 852-3710

23