14 Civ. 2831 (JMF)(FM)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AIDAN DOYLE, MICHAEL SMITH, and WILLIAM
PAYBARAH

                                                        Plaintiffs,

                        -against-

CITY OF NEW YORK,

                                                        Defendant.

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT

**ZACHARY W. CARTER**
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, N.Y.  10007*

*Of Counsel:  Kathryn Martin*
*Tel:  (212) 356-2444*
*Matter No. 2014-015559*

## PRELIMINARY STATEMENT

Plaintiffs' discussion of various tests and analyses developed by the courts to evaluate the nature of relationships between putative employees and their alleged employers is an attempt to confuse the relationship between Plaintiffs and Defendant.  However, a "functional commonsense assessment" of the relationship between Plaintiffs and Defendant can result in no conclusion other than that Plaintiffs voluntarily chose to perform community service rather than proceeding to the adjudication of their charged offenses, with no expectation of compensation other than a report confirming the completion of their service.  The City did not offer Plaintiffs the choice to perform community service or set the terms of the service, nor did it or any of its agencies dictate or carry out the consequences of Plaintiffs' failure to complete their service.  Rather, City agencies provided the means by which Plaintiff could fulfill their agreed-upon community service in order to avoid the time, expense and risk of a criminal trial.  The fact that Plaintiffs were not motivated by purely civic, charitable or humanitarian purposes does not render them employees.  Nor does Plaintiffs' attempt to analogize themselves to participants in workfare programs and temporary workers avoid the inescapable conclusion that Plaintiffs are not employees under the FLSA.  The Second Circuit's recent decision in *Brown v. New York City Dept. of Educ.*, 755 F.3d 154, 160 (2d Cir. 2014) holds that whether someone is a volunteer for a public agency within the meaning of the FLSA is a question of law to be based on the totality of the circumstances.  Accepting the factual allegations of the Amended Complaint as true, the totality of the circumstances demonstrates that the Amended Complaint must be dismissed, with prejudice.

# ARGUMENT

## POINT I

### PLAINTIFFS ARE VOLUNTEERS UNDER THE FLSA

Plaintiffs' argument that they cannot be considered volunteers because they did not perform community service for "civic, charitable, or humanitarian reasons" is antithetical to the way in which courts have repeatedly interpreted the FLSA.  Courts view the "totality of the circumstances" in determining how to classify an individual, especially where, as here, there is no bright line rule in distinguishing between employees and volunteers.  *Brown*, 755 F.3d at 170; *see also Hallissey v. Am. Online, Inc.*, 99-CIV-3785, 2006 U.S. Dist. LEXIS 12964, at \*9 (S.D.N.Y. Mar. 10, 2006) ("Although an individual's classification as an employee or volunteer under the FLSA is a question of law, a court must examine the 'objective facts surrounding the services performed to determine whether the totality of the circumstances supports a holding that, under the statute and under the regulations, the [plaintiffs] are volunteers.'"),[1] citing *Cleveland v. City of Elmendorf*, 388 F.3d 522, 528 (5th Cir. 2004) ("…[t]he definition of volunteer should be applied in a common-sense manner, which takes into account the totality of the circumstances surrounding the relationship between the individual providing services and the entity for which the services are provided."); *see also Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1361 (8th Cir. 1993) ("The employer-employee relationship does not lend itself to rigid per se definitions, but depends upon the circumstances of the whole activity.") (internal quotations omitted).

Plaintiffs further argue that they felt "direct or implied pressure or coercion" to perform the community service based on the "threat" that the city agency would withhold the

---

[1] Notably, the *Hallisey* court did not analyze whether the plaintiff's personal motivations in volunteering to work for AOL were civic, charitable, or humanitarian.

attendance report from the court. *See* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss dated August 15, 2014 ("Pls. Br.") at 7.[2]  As an initial matter, there is no allegation that any city agencies "threatened" to withhold the attendance report from Plaintiffs.  Further, Plaintiff must plead that the alleged pressure they felt came from the "employer," *see* 29 C.F.R. § 553.101(c), which Plaintiffs claim is the City.  Plaintiffs, however, allege they felt pressured to complete the community service because of the "consequences" of failing to do so, *see* Amended Complaint ¶ 9, all of which stem from Plaintiffs' agreement to the ACD, which has nothing to do with the City.   Indeed, Plaintiffs devote an entire page of their brief to discussing the "pressures brought to bear by our plea-bargaining system," *see* Pls. Br. at 8-9 (emphasis added), of which city agencies are not a part.

Moreover, Plaintiffs can hardly compare their choice to either proceed with the adjudication of their minor misdemeanor offenses or agree to a day or two of community service, to that of the plaintiff in *Poventud,* who had already spent nine years in prison and faced the "stark choice" of pleading guilty to a misdemeanor and "go[ing] free immediately" or going to trial and risking a 20 year jail sentence.  *Poventud v. City of New York*, 750 F.3d 121, 141 (2d Cir. 2014).[3]

To illustrate the alleged pressure on Plaintiffs to agree to a court's offer of community service in exchange for an ACD, Plaintiffs make a gigantic leap – supposedly using

---

[2]      It should be noted that Plaintiffs erroneously state that Defendant "conceded" various facts in its brief, *see* Pls. Br. at 6, when in fact Defendant has simply assumed the allegations in the Amended Complaint to be true as it must in a motion to dismiss.
[3]      Contrary to Plaintiffs' argument that criminal defendants only consent to the adjournment of their case as part of an ACD, *see* Pls. Br. at 8, the law expressly provides that:

> The court may as a condition of an adjournment in contemplation of dismissal order, require the defendant to perform services for a public or not-for-profit corporation, association, institution or agency. Such condition may only be imposed where the defendant has consented to the amount and conditions of such service. The court may not impose such conditions in excess of the length of the adjournment.  *See* N.Y. Crim. Law Pr. § 170.55 (6) (emphasis added).

"common sense" -- that ACD volunteers have resorted to bribing City employees to falsify their attendance report. *See* Pls. Br. at 7. This argument fails for several reasons. First, there are no allegations in the Amended Complaint that Plaintiffs, or any other ACD volunteers, bribed City workers; nor are there any allegations that any pressure allegedly experienced by Plaintiffs was exerted by the City. The press releases Plaintiffs cite, *see* Appendix A attached hereto, involve individuals <u>sentenced</u> to perform community service as part of the Alternative Sentencing Program ("ASP"), not criminal defendants who agreed to an ACD that was contingent on performing community service in lieu of proceeding to trial. According to the press releases, ASP participants were bribing city workers to give them certificates of completion without performing the community service. None of the press releases, however, attribute "pressure" as a motivating factor in the offenders' actions. Indeed, rather than feeling "pressured," common sense would dictate that the offenders just did not want to pick up trash for a day and sought to buy their way out of their sentences.[4]

Plaintiffs also quote Rose Gill Hearn, the former Commissioner of the Department of Investigation, for the "unquestionable" conclusion that the City pressures community service workers. *See* Pls. Br. at 9. This "conclusion" is simply incorrect and distorts the statement of Commissioner Gill Hearn. It was in the context of ASP participants bribing city employees to get out of performing their community service that Gill Hearn stated that the individual who made the bribe would have to carry out his or her community service as required by ASP, and the city employee who received the bribe would face criminal charges.

---

[4]     To the extent that a city employee demanded money from an ASP participant, *see* Appendix A, Press Release dated March 18, 2005, there was no threat to withhold the certificate of completion; rather, in exchange for the money, the city worker relieved the participant from his obligation to perform community service and certified that he had completed the community service.

Plaintiffs further misconstrue Gill Hearn's statement as "lump[ing] all community service workers together," *see* Pls. Br. at 9 n.7, when in the context of the statement, she is referring to individuals in ASP. Plaintiffs rebuke Gill Hearn and the press in general for "los[ing] sight of th[e] potentially significant distinction" between criminal defendants who <u>choose</u> to perform community service as a condition of an ACD and criminal offenders who are <u>sentenced</u> to perform community service, *see id.*, yet conveniently disregard the distinction when citing the Los Angeles Times article, *see* Appendix B attached hereto, which claims that cities receive "millions of dollars in free labor" from criminal offenders sentenced to community service instead of jail, not criminal defendants who agreed to ACDs.[5]

Plaintiffs' contention that they are not volunteers because they were not motivated by humanitarian or charitable instincts is inconsistent with the Second Circuit's decision in *Brown,* which rejected the argument that to qualify as a volunteer under the FLSA, an individual must act solely for civic, charitable or humanitarian purposes. *Brown,* 755 F.3d at 163-164. Because the plaintiff in *Brown* admitted that he was motivated by a civic, charitable or humanitarian purpose and by a desire to build his resume and to increase his career opportunities, the Second Circuit did not decide whether the FLSA requires that an individual be at least partially motivated by civic, charitable or humanitarian reasons to qualify as a volunteer under the act. *Id.* at 163 n6. The Second Circuit further noted that the regulation does not require that civic, charitable or humanitarian reasons be exclusive, singular or predominant. *Id.* at 163-164. The Court found that the limiting intent of the regulation was "defined not by the volunteer's exclusivity of purpose, but, rather, by his free choice in providing services without payment." *Id.* at 164. Most importantly, the Second Circuit expressly recognized that volunteers provide a

---

[5]     Moreover, Gill Hearn's use of the word "sentenced" is correct because ASP participants are criminal offenders who are sentenced to perform community service. *See* Appendix A, June 28, 2006 press release. Plaintiffs' repeated mischaracterizations demonstrate the precarious nature of their legal arguments.

public agency with free services for a variety of reasons, including "to secure community approbation" or "to make amends for unrelated wrongs." *Id.*

While recognizing that exceptions to the minimum wage provisions of the FLSA must be narrowly construed, the Second Circuit also explicitly recognized that neither Congress nor the Department of Labor would favor a construction that would discourage or impede volunteer services to public agency. *Brown,* 755 F.3d at 164. Defendant submits that an interpretation of the FLSA that would transform criminal defendants who agree to perform community service in exchange for an ACD into municipal employees would not only be contrary to the intent of the statute, but would also discourage public agencies from participating in such programs to the detriment of the criminal justice system and criminal defendants.

## POINT II

## <u>WORKFARE PARTICIPANTS ARE NOT ANALOGOUS TO PLAINTIFFS</u>

Plaintiffs claim that participants in the Work Experience Program ("WEP") are analogous to Plaintiffs herein and therefore both are "employees" within the meaning of the FLSA. Again, this argument is without merit.

In *United States of Am. v. City of New York*, 359 F.3d 83, 92 (2d Cir. 2004), the Second Circuit took a "functional commonsense assessment of the plaintiffs' alleged relationship with the city" in determining that WEP participants were "employees" under Title VII. In doing so, the Court found that in return for their work for the City, the WEP participants received cash payments and food stamps that equaled payment of the minimum wage for the number of hours they worked, in what the Court found to be "an all too typical way of calculating compensation for work." *Id.* at 96.

The Northern and Western Districts followed the *City of New York* reasoning in determining that WEP participants are "employees" under the FLSA. *See Elwell v. Weiss*, No. 03-cv-6121, 2006 U.S. Dist. LEXIS 96934, at *11-12 (W.D.N.Y. Sept. 29, 2006); *Stone v. McGowan*, 308 F. Supp. 2d 79, 84-87 (N.D.N.Y. 2004). These courts further focused on the legislative history of the workfare program, and in particular the Department of Labor's position that workfare programs like WEP would be covered under the FLSA. There is no such similar legislative history pertaining to criminal defendants who agree to perform community service in exchange for an ACD.

Further, Plaintiffs differ significantly from WEP participants. In both *City of New York* and *Elwell*, the public entity that was providing the benefits also dictated the terms of the work and provided the means by which the participants completed the work. For example, the plaintiffs in *City of New York* applied to the City for benefits and in exchange worked for city agencies. 308 F. Supp. 2d at 88-90. In *Elwell*, the plaintiff applied to the County of Schuyler for benefits and in exchange worked for the Schuyler County Mobile Work Crew. 2006 U.S. Dist. LEXIS 96934, at *4-5. A "functional commonsense assessment" of the relationship between these WEP participants and the defendants in *City of New York* and *Elwell* resulted in a finding of a traditional employer-employee relationship: the WEP participants applied for benefits from the public entity and in exchange for working for the public entity, they were paid in benefits equal to the minimum wage based on the hours worked.

Here, in contrast, the judiciary system is dictating the terms and conditions of the community service and is conferring the benefit to Plaintiffs. It is the City agencies that simply serve as a vehicle by which Plaintiffs may fulfill their agreed upon service.

The facts here are more analogous to those in *Isaacson v. Penn Cmty. Servs., Inc.*, 450 F.2d 1306, 1310 (4th Cir. 1971), in which the court found that a conscientious objector who performed civilian work for a non-profit in lieu of induction into the armed forces was not covered under the FLSA. Both here and in *Isaacson*, the plaintiffs were legally obligated to participate in a government activity (here, the criminal justice system, in *Isaacson*, military service) but were given the option to satisfy their legal obligation by working for a non-profit entity instead. The *Isaacson* court likened the plaintiff to the trainees[6] in *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947), emphasizing that while the non-profit entity may have received a benefit from the plaintiff's service, the principal benefit was to the plaintiff. *See* 450 F.2d at 1309-1310; *see also Hallisey*, 2006 U.S. Dist. LEXIS 12964, at *32-40 (examining the benefit to AOL and the benefit to plaintiffs in determining whether plaintiffs were employees or volunteers). Similarly here, while the City may have received a limited benefit from Plaintiffs' three days of community service, Plaintiffs reaped a "substantial benefit" in avoiding the time, expense and risk of trial. *See* Amended Compl. ¶ 12.[7] Further, whereas the WEP participants were earning their benefits, Plaintiffs, like the conscientious objector in *Isaacson*, were satisfying a legal obligation.

Plaintiffs' argument that the City was a "joint employer" is also misplaced. The "joint employer" analysis is only appropriate when an individual is clearly employed by one entity and the question is whether a separate entity may also be deemed an employer under the FLSA. *See Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 67 n.2 (2d Cir. 2003) (citations omitted).

---

[6]     It need only be mentioned that Plaintiffs spend considerable time in their opposition arguing that the "trainee" and intern exceptions are inapplicable to the Plaintiffs herein. It is entirely unclear why plaintiffs addressed this FLSA exception so thoroughly in their opposition when defendants did not move to dismiss the complaint based on this exemption.
[7]     The *Isaacson* court further explained that because the defendant was a non-profit organization, any benefit it received from the plaintiff's work was really a "benefit to the public at large." 330 U.S. at 1309-1310.

Once again, Plaintiffs attempt to save their claims by invoking completely irrelevant tests and standards.

Nevertheless, indulging this irrelevant argument for a moment, Plaintiffs conveniently ignore the joint-employer case law which provides that the formal control test cited by Plaintiffs is not to be employed blindly and should be considered in light of the "underlying policies of the FLSA." *See Danneskjold v. Hausrath*, 82 F.3d 37, 42 (2d Cir. 1996).  Indeed, the Second Circuit explained in *Danneskjold* that a rigid application of the economic reality test would render all prison labor subject to minimum wage law despite the fact that "labor that serves institutional needs of the prison is not in economic reality an employment relationship." *Id.* at 42-43; *see also Zheng,* 355 F.3d at 76 (explaining that the economic realities test "is manifestly not intended to bring normal, strategically-oriented contracting schemes within the ambit of the FLSA").  Rather, the "test is designed to constrain the otherwise broadly applicable plain language of the statute, which taken literally would support liability against any agent or employee with supervisory power over other employees." *Diaz v. Consortium for Worker Educ., Inc.,* No. 10-CV-1848, 2010 U.S. Dist. LEXIS 107722, at *6 (S.D.N.Y Sept. 28, 2010) (internal quotations and alterations omitted).

Here, the "economic reality" is that Plaintiffs – who chose to volunteer to perform community service – are not in an employment relationship with the City simply because the City exercises some degree of supervision over them while they perform their community service and provides them with documentation to demonstrate that they completed the service that they agreed to provide.  If this were the case, then, all volunteers who are told where to report and for how long and who are instructed on what to do while there, would be employees.  Similarly, Plaintiffs overreach in arguing that the City's ability to reject an ACD criminal

defendant from community service is equivalent to "hiring and firing." *See* Pls. Br. at 20.  Even if a particular city agency did not, for whatever reason, permit an ACD criminal defendant to fulfill his or her community service with that agency, there is no allegation that the city agency has the power to revoke or in any way affect the ACD.  *See Godlewska v. Human Dev. Assoc.,* 916 F. Supp. 2d 246, 258 (E.D.N.Y. 2013) (city agency did not have formal control over home attendants because it did not have power to require their employer to fire them entirely).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court issue an order granting its motion to dismiss the Amended Complaint in its entirety together with such other and further relief as this Court deems just and proper.

Dated:      New York, New York
            September 5, 2014

> **ZACHARY W. CARTER**
> Corporation Counsel of the
>    City of New York
> Attorney for the Defendant
> 100 Church Street, Room 2-102
> New York, New York 10007
> (212) 356-2444
> kmartin@law.nyc.gov

> By: _____/s/_____
>          Kathryn E. Martin
>          Senior Counsel

- 10 -

# APPENDIX A



### The City of New York
### Department of Investigation

ROSE GILL HEARN

COMMISSIONER

80 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

**Release # 23-2005**
nyc.gov/doi

**FOR IMMEDIATE RELEASE**
**FRIDAY, MARCH 18, 2005**

CONTACT:   **EMILY GEST**
          **(212) 825-5931**

## STATEMENT FROM DEPARTMENT OF INVESTIGATION COMMISSIONER ROSE GILL HEARN
## REGARDING THE ARREST OF CITY PARKS WORKER

Essex Pope, a Crew Chief for the New York City Department of Parks and Recreation, was charged today in Manhattan State Court with Bribe Receiving in the Third Degree, a class D Felony, Falsifying Business Records in the First Degree, a class E Felony; and Receiving Reward for Official Misconduct in the Second Degree, an E Felony. If convicted, he faces up to seven years in jail.

Pope, 47, of the Bronx, allegedly demanded money from participants who were obligated to perform community service in the Alternative Sentencing Program. In exchange for the money, Pope relieved the participants from their obligation to perform community service and certified that they had completed their obligation. Most often, these individuals were assigned to clean up litter and other trash in Marcus Garvey Park (Mount Morris Park) in Central Harlem where Pope worked. Two DOI undercover investigators allegedly paid Pope $100 and $140 respectively so they would not have to complete their community service.

Mr. Pope perverted the criminal justice system to line his own pockets. Now he will experience the criminal justice system as a defendant. He will be prosecuted to the fullest extent of the law and those sentenced to community service will have to keep the parks clean and green the way they are supposed to.

In addition to its investigation of Mr. Pope, DOI proactively initiated undercover investigations at other City Parks worksites. I applaud those hard-working, honest Parks workers because they did not solicit bribes from those undercover investigators.

I thank the Office of Manhattan District Attorney Robert M. Morgenthau for handling this matter, as well as the Commissioner of the Department of Parks and Recreation, Adrian Benepe, for his assistance and cooperation.

*DOI is one of the oldest law-enforcement agencies in the country. The agency investigates and refers for prosecution City employees and contractors engaged in corrupt or fraudulent activities or unethical conduct. Investigations may involve any agency, officer, elected official or employee of the City, as well as those who do business with or receive benefits from the City.*

***Get the worms out of the Big Apple.***
***To report someone ripping off the city, call DOI at (212) 825-5959.***



The City of New York
Department of Investigation

ROSE GILL HEARN

COMMISSIONER

80 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

Release #32-2006
www.nyc.gov/doi

**FOR IMMEDIATE RELEASE**
**TUESDAY, APRIL 25, 2006**

**CONTACT: ERIN BYRNE**
**(212) 825-5931**

### DOI ARRESTS PARKS EMPLOYEE FOR ACCEPTING BRIBES

ROSE GILL HEARN, Commissioner of the Department of Investigation (DOI), today announced the arrest of JANET BILLUPS, a City Seasonal Aide, with the New York City Department of Parks and Recreation (DPR), for allegedly receiving bribes totaling $80 from a DOI undercover posing as an Alternative Sentencing Program (ASP) participant who bought his way out of two days of court-ordered community service in Union Square Park.

BILLUPS, 45, of Manhattan, will be charged with Bribe Receiving in the Third Degree, a class D felony, and Offering a False Instrument for Filing in the First Degree, a class E felony. If convicted, she faces up to seven years in prison.

DOI began its investigation after DPR reported suspicions that ASP participants were offering bribes to DPR employees in order to buy their way out of court-ordered community service in Union Square Park. ASP participants are defendants who have committed offenses ranging from violations to misdemeanors and are sentenced to perform community service. On one occasion, a DOI undercover posing as an ASP participant reported to work at Union Square Park and asked BILLUPS, "Anything I can do to get outta this? You take care of me, I take care of you?" After the brief conversation, BILLUPS agreed to accept $40 from the undercover investigator in exchange for allowing him to sign in and out on the ASP attendance sheet after only about 15 minutes and recording the times on the sheet to reflect that he'd worked eight hours. During this meeting, BILLUPS warned the undercover investigator that she would not be able to help him on his next community service date if her supervisor was present saying "She can't be here. I can only do it when she's not here." When the undercover investigator reported for service one week later, BILLUPS waited for her supervisor to go into the field, and then accepted another $40 bribe from the DOI undercover saying "I'll give you credit for the whole day." BILLUPS then allowed the undercover to sign in and out on the ASP attendance sheet after about 60 minutes and recorded the times on the sheet to reflect that he'd worked eight hours.

BILLUPS' understanding was that the undercover investigator was sentenced to serve a total of 16 hours over two days doing community service in Union Square Park. However, after receiving the two separate bribes of $40, BILLUPS allowed the undercover investigator to leave after serving only about 15 minutes on one day and about 60 minutes another day. She recorded the times on the ASP paperwork reflecting that the undercover investigator had worked his full 16 hours of community service.

DOI Commissioner Rose Gill Hearn said, "Ms. Billups perverted the criminal justice system to line her own pockets. Now she will experience the criminal justice system as a defendant. She will be prosecuted to the fullest extent of the law and those sentenced to community service will have to keep the parks clean and green the way they are supposed to."

DOI Commissioner Rose Gill Hearn thanked the Department of Parks and Recreation Commissioner Adrian Benepe and his staff for their assistance and cooperation in the investigation.

The investigation was conducted by DOI's Deputy Commissioner Vincent E. Green, Deputy Inspector General Theresa Land-Latta, and First Assistant Inspector General Jeff Dolcimascolo.

The Office of the Manhattan County District Attorney Robert M. Morgenthau is prosecuting and Assistant District Attorney Lauren Littman is handling the matter.

Criminal complaints are accusations. Defendants are presumed innocent until proven guilty.



The City of New York
Department of Investigation

ROSE GILL HEARN

COMMISSIONER

80 MAIDEN LANE
NEW YORK, NY 10038
212-825-5900

Release # 64-2006
nyc.gov/html/doi

**FOR IMMEDIATE RELEASE**
**WEDNESDAY, JUNE 28, 2006**

CONTACT:  CAROL STRICKLAND
(212) 825-5931

### DOI ARRESTS PARKS EMPLOYEE FOR ACCEPTING BRIBE

ROSE GILL HEARN, Commissioner of the New York City Department of Investigation (DOI), today announced the arrest of GREGORY FERGUSON, a Crew Chief with the New York City Department of Parks and Recreation (DPR), for allegedly receiving a $60 bribe from a DOI undercover investigator posing as an Alternative Sentencing Program (ASP) participant in exchange for buying his way out of two days of court-ordered community service in McCarren Park in Brooklyn.

FERGUSON, 45, of Manhattan, has been charged with Bribe Receiving in the Third Degree, a class D felony, Offering a False Instrument for Filing in the First Degree, a class E felony, and Receiving Reward for Official Misconduct in the Second Degree, a class E Felony.  If convicted, he faces up to seven years in prison.

Commissioner Gill Hearn said, "Community service is not meant to be a walk in the park.  It is a court-ordered alternative to jail time and is meant to be served.  Excusing an ASP participant from assigned community service in exchange for personal monetary gain is a crime and DOI will continue to actively monitor and arrest such individuals."

ASP participants are defendants who have committed offenses ranging from violations to misdemeanors, and are sentenced to perform community service.  Following the arrests of DPR employees JANET BILLUPS in April 2006 and ESSEX POPE in March 2005 for receiving bribes from ASP participants in Manhattan, DOI conducted proactive integrity tests of DPR employees in Brooklyn's parks to determine if ASP participants in that borough could buy their way out of court-ordered community service.  POPE was sentenced to 90 days in jail and 200 hours of community service; BILLUPS' case is currently pending.

On June 10, 2006, a DOI undercover investigator posing as an ASP participant serving two days of community service, met with FERGUSON at McCarren Park in Brooklyn.  The undercover told FERGUSON that he did not want to work and asked FERGUSON if he could leave.  According to the criminal complaint, FERGUSON stated to the undercover, "Okay, Okay, sixty bucks.  We just got to keep this between me and you though."  After the undercover paid Ferguson $60 for two days of credit, FERGUSON told him to return at 7:00 a.m. the next day, June 11, 2006, at which time FERGUSON told the undercover to sign a weekly attendance sheet for June 10 and 11, 2006.  FERGUSON then checked two boxes on the form stating that the undercover completed two days of community service.

DOI Commissioner Gill Hearn thanked DPR Commissioner Adrian Benepe and his staff for their assistance and cooperation in the investigation.

The investigation was conducted by DOI Deputy Inspector General for DPR Theresa Land-Latta, and members of her staff, including Chief Investigator Belarminia Ortiz and Confidential Investigator George Shabouk, under the supervision of DOI Deputy Commissioner Vincent E. Green.  The Office of the Brooklyn District Attorney Charles J. Hynes is prosecuting the case.

Criminal complaints are accusations. Defendants are presumed innocent until proven guilty.

*Get the worms out of the Big Apple.*
*To report someone ripping off the City, call 212-825-5959.*

# APPENDIX B

8/19/2014    2 Park Employees Face Charges of Bribe Solicitation : Crime: The pair are accused of accepting cash from an offender to excuse him from court-ordered …

## Los Angeles Times | ARTICLE COLLECTIONS

‹ Back to Original Article

# 2 Park Employees Face Charges of Bribe Solicitation : Crime: The pair are accused of accepting cash from an offender to excuse him from court-ordered work.

February 04, 1993 | JOSH MEYER | TIMES STAFF WRITER

Capping a five-month investigation, authorities arrested two Los Angeles city recreation and parks employees Wednesday on charges of soliciting a bribe from a convicted offender so he could avoid performing court-ordered community service work.

Gardening Supervisor Willard M. Stone and gardener Manuel Galvin Perez were taken into custody while working at the Department of Recreation and Parks Northridge District maintenance yard, where the bribe allegedly took place.

"The district attorney views this type of violation as serious," Deputy Dist. Atty. Reid A. Rose said. "It should send a message to anyone out in the community that they should do their community service or they'll face additional criminal consequences, and to public employees that we'll prosecute them criminally for breaching the public trust by accepting bribes."

Both men were being held late Wednesday in lieu of $15,000 bail each. Stone, 51, of Granada Hills has worked for the department for more than 26 years. He faces a maximum five years and eight months in state prison and $10,000 in fines if convicted. Perez, 41, of Pacoima faces a maximum of five years in prison and $10,000 in fines if convicted.

Authorities originally were investigating a third, unidentified, recreation and parks employee, but said Wednesday that no charges would be filed in his case.

At today's arraignment, Stone and Perez will be charged with two felony counts each of bribery, authorities said. Stone also will be charged with two felony counts of preparing false documents for allegedly doctoring time sheets to show that the offender had spent time gardening at city parks to fulfill his court-appointed community service work.

The two were arrested after the offender told authorities that Stone and Perez allegedly solicited a bribe from him. The offender, who agreed to cooperate in a sting operation, had been ordered to perform 300 hours of community service following a conviction. After doing some of the work, he was told by Stone and Perez that "things could be taken care of if he paid $125," Rose said.

Rose said it was believed that the bribe was solicited Sept. 14, 1992, and that Stone and Perez accepted the bribe three weeks later.

Stone and Perez were first arrested late last year and released pending further investigation. Since that time, Stone has maintained his innocence, said his lawyer, Fred Bien. Perez could not be reached for comment.

Elliott Porter, personnel director for the Recreation and Parks Department, said the two men originally were to face an administrative hearing, but that parks officials wanted to wait until the results of the criminal investigation were complete before deciding whether to fire them. He said the two men continued to work because they were no longer allowed to oversee community service workers since their initial arrest, and because "they are certainly not a danger to anyone."

The value of the court-ordered service runs into the millions of dollars in free labor for cash-strapped cities and counties, which rely on the workers to clean parks and roadsides and for a host of other tasks.

Since the initial arrest of Stone and Perez, public and private agencies throughout Los Angeles County have taken steps to ensure that the hundreds of thousands of offenders sentenced to do community service as an alternative to jail perform their appointed tasks.

Some authorities, however, said that problems in the community-service program continue despite some recent improvements, due to lax oversight in a few cases and the sheer numbers of court-ordered workers going through the system. At least 2,500 offenders a month are placed in public and private community service programs in the San Fernando Valley alone.

"The problem, I believe, is widespread, with community service workers being allowed the opportunity to buy their way out," said Rose, a Special Investigations Division prosecutor who handles community service and public corruption cases. "It probably occurs with city and county employees as well as the employees of the nonprofit agencies that administer the community service programs; the employees receive money in exchange for writing off the hours."

Rose said there are ongoing investigations into community service fraud by his office and the Los Angeles Police Department, and that he continues to advise judges and community service agencies on how to look for fraud and tighten monitoring procedures.

Judge Andrew Kauffman, chairman of the alternative sentencing committee for the Los Angeles Municipal Court, acknowledged there is a potential for abuse, but he said it is rare and not coordinated.

"Of course, we're concerned. We rely to a tremendous extent on people not affiliated with the court system to monitor the conduct of people we place on probation," said Kauffman, who is also the supervising judge in Hollywood Municipal Court. "But short of having some court employee actually on site, we're pretty much stuck with what we've got."

8/19/2014     2 Park Employees Face Charges of Bribe Solicitation : Crime: The pair are accused of accepting cash from an offender to excuse him from court-ordered …

The Municipal Court recently considered hiring a compliance officer to visit public and private agencies that receive referrals from the court to make sure they are properly monitoring the community service workers. "But given the current budget situation, it's out of the question," he said.

The Volunteer Center of Los Angeles, which channels most of the Los Angeles court referrals in areas south of the San Fernando Valley into community service projects, has hired a monitor "to keep a closer eye on things," Executive Director Charles Fox said. And Joan Kagen, manager of the court referral program for the Volunteer Center of the San Fernando Valley, said her program also has tightened up its oversight considerably.

Porter said the city Recreation and Parks Department has limited the number of supervisors who can approve the time sheets that offenders must return to court to show they have done their community service. "We've tightened up departmentwide and worked with our volunteer centers so that this type of thing will not happen again," he said.

---

**Los Angeles Times**  Copyright 2014 Los Angeles Times          Index by Keyword | Index by Date | Privacy Policy | Terms of Service

## INDEX

**APPENDIX A**:  Press Release dated March 18, 2005; Press Release dated April 25, 2006; Press Release dated June 28, 2006

**APPENDIX B**:  Los Angeles Times Article, dated February 4, 1993, "2 Park Employees Face Charges of Bribe Solicitation: The pair are accused of accepting cash from an offender to excuse him from court-ordered work."